

*Central Valley* **Eden Environmental Defenders**

October 3, 2022

<u>Via US Mail, Certified and Email</u>

Joseph Guido          Email:  joseph.guido@nutrien.com
Nutrien Ag Solutions
14442 Walnut Grove Thornton Rd
Walnut Grove, CA 95690

<u>Via US Mail</u>

C T Corporation System
Agent for Nutrien Ag Solutions, Inc.
330 North Brand Boulevard, Suite 700
Glendale, CA 91203

Jeff Tarsi
Nutrien Ltd.
3005 Rocky Mountain Avenue
Loveland, CO 80538

**Re:      60-Day Notice of Violations and Intent to File Suit Under the Federal Water
Pollution Control Act ("Clean Water Act")**

To Officers, Directors, Operators, Property Owners and/or Facility Managers of Nutrien Ag
Solutions, Inc., Crop Production Services, Inc., dba Nutrien Ag Solutions, and Nutrien Ltd:

This letter is being sent to you on behalf of Central Valley Eden Environmental Defenders, LLC
("EDEN") to give legal notice that EDEN intends to file a civil action against Nutrien Ag
Solutions, Inc. and/or Crop Production Services, Inc., dba Nutrien Ag Solutions, and/or Nutrien
Ltd ("Discharger" or "Nutrien Ag Solutions") and their respective corporate officers and other
legally responsible parties for violations of the Federal Clean Water Act ("CWA" or "Act") 33
U.S.C. § 1251 *et seq.,* that EDEN believes are occurring at the Nutrien Ag Solutions facility
located at 14442 Walnut Grove Thornton Road in Walnut Grove, California ("the Facility" or
"the site").

---

1520 E. Covell Blvd #B5                     Telephone:  (800) 545-7215
Davis, CA  95616                            Email:  admin@edendefenders.org

EDEN is an environmental citizen's group established under the laws of the State of California to protect, enhance, and assist in the restoration of all rivers, creeks, streams, sloughs, lakes and tributaries of California, for the benefit of its ecosystems and communities.

As discussed below, the Facility's discharges of pollutants degrade water quality and harm aquatic life in the Facility's Receiving Waters, which are waters of the United States and are described in Section II.B, below. EDEN has members throughout California. Some of EDEN's members live, work, and/or recreate near the Receiving Waters and use and enjoy the Receiving Waters for kayaking, canoeing, camping, fishing, boating, swimming, hiking, cycling, bird watching, picnicking, viewing wildlife, and/or engaging in scientific study.

At least one of EDEN's current members has standing to bring suit against Nutrien Ag Solutions, as the unlawful discharge of pollutants from the Facility as alleged herein has had an adverse effect particular to him or her and has resulted in actual harm to the specific EDEN member(s).

Further, the Facility's discharges of polluted storm water and non-storm water are ongoing and continuous. As a result, the interests of certain individual EDEN members have been, are being, and will continue to be adversely affected by the failure of Nutrien Ag Solutions to comply with the General Permit and the Clean Water Act.

CWA section 505(b) requires that sixty (60) days prior to the initiation of a civil action under CWA section 505(a), a citizen must give notice of intent to file suit. 33 U.S.C. § 1365(b). Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("EPA"), and the EPA in the state in which the violations occurred or are occurring.

As required by CWA section 505(b), this Notice of Violation and Intent to File Suit provides notice to the Discharger of the violations which have occurred and continue to occur at the Facility. After the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, EDEN reserves the right to file suit in federal court against Nutrien Ag Solutions under CWA section 505(a) for the violations described more fully below, if this matter cannot be resolved.

## I.      THE SPECIFIC STANDARD, LIMITATION OR ORDER VIOLATED

EDEN's investigation of the Facility has uncovered significant, ongoing, and continuous violations of the CWA and the General Industrial Storm Water Permit issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board ("SWRCB")] Water Quality Order No. 2014-0057-DWQ as amended by Orders 2015-0122-DWQ and 2018-XXXX-DWQ) (hereinafter "General Permit").

Information available to EDEN, including documents obtained from California EPA's online Storm Water Multiple Application and Reporting Tracking System ("SMARTS"), indicates that on or around November 4, 2008, Nutrien Ag Solutions submitted a Notice of Intent ("NOI") to be authorized to discharge storm water from the Facility under the General Permit. Nutrien Ag Solutions' assigned Waste Discharger Identification number ("WDID") is 5S34I021915.

As more fully described in Section III, below, EDEN alleges that in its operations of the Facility, Nutrien Ag Solutions has committed ongoing violations of the substantive and procedural requirements of the Federal Clean Water Act, California Water Code §13377, et seq; the General Permit; the Regional Water Board Basin Plan; the California Toxics Rule (CTR); 40 C.F.R. Chapter I, Subchapter N, § 400, et seq.; and California Code of Regulations, Title 22, § 64431.

## II.     THE LOCATION OF THE ALLEGED VIOLATIONS

### A.  **The Facility**

The location of the point sources from which the pollutants identified in this Notice are discharged in violation of the CWA is Nutrien Ag Solutions' permanent facility address of 14442 Walnut Grove Thornton Road in Walnut Grove, California.

Nutrien Ag Solutions is a facility that distributes pre-packaged agricultural products and blends liquid fertilizers.  Facility operations are covered under Standard Industrial Classification Code (SIC) 2875 - Fertilizer, mixing only.

Based on the EPA's Industrial Storm Water Fact Sheet for industrial businesses with the SIC code of 2875, stormwater run-off discharges contain many pollutants on the list of chemicals published by the State of California known to cause cancer, birth defects, and/or developmental or reproductive harm, including toxic and heavy metals, pH affecting substances, total suspended solids, and various types of oil and grease, as well as iron, nitrates and nitrites (N+N), lead, zinc, phosphorus, boron, flouride, aluminum, calcium, benzene, copper, chloripyrifos, diazinon, biochemical oxygen demand (BOD), chemical oxygen demand (COD), sulfur, chlorine and ammonia.

Information available to EDEN indicates that the Facility's industrial activities and associated materials are exposed to storm water, and that each of the substances listed on the EPA's Industrial Storm Water Fact Sheet is a potential source of pollutants at the Facility.

### B.  **The Affected Receiving Waters**

The Facility discharges into the North Mokelumne River, a tributary of the Sacramento-San Joaquin River Delta ("Receiving Waters").  The North Mokelumne River and Sacramento-San Joaquin River Delta are impaired for Carcinogenic Pesticide Screen, Chlorpyrifos, Diazinon,

Dieldrin, Dissolved Oxygen, Copper, Mercury, Zinc, PCBs (Polychlorinated biphenyls), Chlordane and Total DDT (including DDD, DDE and DDT).

The Sacramento-San Joaquin River Delta is a water of the United States. The CWA requires that water bodies such as the Sacramento-San Joaquin River Delta meet water quality objectives that protect specific "beneficial uses." The Regional Water Board has issued its *Water Quality Control Plan for the Sacramento-San Joaquin Delta Basin* ("Basin Plan") to delineate those water quality objectives.

The Basin Plan identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the Receiving Waters downstream of the Facility include: Municipal and Domestic Supply (MUN), Agricultural Supply (AGR), Industrial Process Supply (PRO), Industrial Service Supply (IND), Navigation (NAV), Water Contact Recreation (REC-1), Non-contact Water Recreation (REC-2), Warm Freshwater Habitat (WARM), Cold Freshwater Habitat (COLD), Wildlife Habitat (WILD), Migration (MIGR), and Spawning, Reproduction, and/or Early Development (SPWN).

A water body is impaired pursuant to section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d), when its Beneficial Uses are not being achieved due to the presence of one or more pollutants. Polluted storm water and non-storm water discharges from industrial facilities, such as the Facility, contribute to the further degradation of already impaired surface waters, and harm aquatic dependent wildlife.

## III.    VIOLATIONS OF THE CLEAN WATER ACT AND GENERAL PERMIT

### A.    *Deficient SWPPP*

Nutrien Ag Solutions' current Storm Water Pollution Prevention Plan ("SWPPP") and Site Map for the Facility are inadequate and fail to comply with the requirements of the General Permit as specified in Section X of Order No. 2014-0057-DWQ, as delineated below.

(a) The SWPPP fails to include the **date of each historical SWPPP Amendment** (Section X.A.10);

(b) The SWPPP fails to discuss in detail **Facility operations and all industrial processes** at the Facility, including manufacturing, cleaning, maintenance, recycling, disposal, and any other activities related to each industrial process; and the type, characteristics, and approximate quantity of industrial materials used in or resulting from the process. Areas protected by containment structures and the corresponding containment capacity are also required to be identified and described. (X.G.1.a);

(c) The **Minimum Best Management Practices** (BMPs) as indicated in the SWPPP are insufficient and/or they do not comply with the minimum required categories as listed in the General Permit, which include Good Housekeeping, Preventive Maintenance, Spill and Leak Prevention and Response, Material Handling and Waste Management, Erosion and Sediment Controls, Employee Training Program and Quality Assurance and Record Keeping (Section X.H.1);

(d) The **Advanced BMP**s as identified in the SWPPP are inadequate to comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in the Facility's storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability, including Exposure Minimization BMPs, Storm Water Containment and Discharge Reduction BMPs or Treatment Control BMPs (Section X.H.2);

(e) The SWPPP fails to discuss in detail factors related to the **stormwater containment system**, including its maximum capacity, whether it is designed to conform with the requirements of Section X.H.6 of the General Permit (Design Storm Standards for Treatment Control BMPs), or whether it is engineered and constructed to contain the maximum historic precipitation event;

(f) The SWPPP fails to include an adequate discussion of the **Facility's Receiving Waters and Receiving Water impairments.** (Section XI.B.6.e, Section X.G.2.ix);

(g) The SWPPP does not contain an adequate pollutant source assessment and the corresponding proper **sampling parameters** to include all potential pollutants present at the facility likely to come into contact with stormwater (Section XI.B.6).

The SWPPP includes as Potential Pollutants present in industrial operations at the facility: **flouride, boron, ammonia, aluminum, calcium, benzene, copper, chlorpyrifos, diazinon, BOD, COD, sulfur and chlorine**, including that the potential pollutant materials are stored outdoors. The SWPPP fails to include these pollutants as **additional sampling parameters**, in violation of Section XI.B.6.c of the General Permit; and

(h) The SWPPP fails to identify that the Facility is subject to 40 CFR Subchapter N ELGs.

Failure to develop or implement an adequate SWPPP is a violation of Sections II.B.4.f and X of the General Permit.

### B.   Failure to Develop, Implement and/or Revise an Adequate Monitoring and Reporting Program Pursuant to the General Permit

Section XI of the General Permit requires Dischargers to develop and implement a storm water monitoring and reporting program ("M&RP") prior to conducting industrial activities. Dischargers have an ongoing obligation to revise the M&RP as necessary to ensure compliance with the General Permit.

The objective of the M&RP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations.  An adequate M&RP ensures that BMPs are effectively reducing and/or eliminating pollutants at the Facility, and it must be evaluated and revised whenever appropriate to ensure compliance with the General Permit.

1.   Failure to Conduct Visual Observations

Section XI.A of the General Permit requires all Dischargers to conduct visual observations at least once each month, and sampling observations at the same time sampling occurs at a discharge location.

Observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, odor, and the source of any pollutants.   Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges.

EDEN believes that between October 15, 2017 and the present, Nutrien Ag Solutions has failed to conduct monthly and sampling visual observations pursuant to Section XI.A of the General Permit and to maintain contemporaneous written Visual Observation Reports confirming that visual observations were conducted.

2.   Failure to Collect and Analyze the Required Number of Storm Water Samples

In addition, EDEN alleges that Nutrien Ag Solutions has failed to provide the Regional Water Board with the minimum number of annual documented results of Facility run-off sampling as required under Sections XI.B.2 and XI.B.11.a of Order No. 2014-0057-DWQ, in violation of the General Permit and the CWA.

Section XI.B.2 of the General Permit requires that all Dischargers collect and analyze storm water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30).

Section XI.C.6.b provides that if samples are not collected pursuant to the General Permit, a proper and accurate explanation must be included in the Annual Report.

As of the date of this Notice, Nutrien Ag Solutions has failed to upload into the SMARTS database system the required number of storm water run-off sample analysis for the reporting years 2017-2018, 2018-2019, 2019-2020 and 2020-2021 and has not provided an adequate explanation for its failure to do so.

3. <u>Failure to Collect Storm Water Run-Off Samples during Qualified Storm Events</u>

Pursuant to Section XI.B.1 of the General Permit, a Qualified Storm Event (QSE) is a precipitation event that both produces a discharge for at least one drainage area at the Facility and is also preceded by 48 hours with no discharge from any drainage area.

The General Permit defines "drainage area" as the "area of land that drains water, sediment, pollutants, and dissolved materials to a common discharge location."   (Attachment C to General Permit-Glossary)

Nutrien Ag Solutions' stormwater runoff sample(s) collected as listed below were not collected during Qualified Storm Events as defined by the General Permit:

| Sample Date | QSE Info |
|---|---|
| 3/22/2018 | Not a valid QSE – 3rd consecutive day of rainfall |
| 4/7/2018 | Not a valid QSE – 3rd consecutive day of rainfall |
| 1/28/2021 | Not a valid QSE – 3rd consecutive day of rainfall |
| 10/22/2021 | Not a valid QSE – 3rd consecutive day of rainfall |
| 11/9/2021 | Not a valid QSE – 3rd consecutive day of rainfall |

4. <u>Failure to Deliver Storm Water Samples to a Laboratory within 48 Hours of Collection</u>

Pursuant to Attachment H, Section 2 of the General Permit, Dischargers are to deliver storm water runoff samples to a qualified Laboratory within 48 hours of the date and time of physical sampling.  Nutrien Ag Solutions' storm water runoff samples listed below were not delivered to the Facility's Laboratory Alpha Analytical Laboratories in that time frame:

| Sample Date/Time | Date/Time Laboratory Received Sample |
|---|---|
| 4/7/2018 08:30 | 4/9/2018 22:45 |
| 10/22/2021 9:00 | 10/25/2021 23:50 |
| 11/9/2021 08:50 | 11/11/2021 22:20 |

5.  Failure to Sample Correctly for the Parameter of pH

Pursuant to Section XI.C.2.a of the General Permit, the storm water sample "holding" time for pH analysis is 15 minutes.  Nutrien Ag Solutions' laboratory report for the sample collected on October 22, 2021, evidence that the litmus test for the Facility's pH was not conducted within the required 15-minute holding time.

6.  Failure to Upload Storm Water Sample Analyses within 30 Days

Section XI.B.11.a of the General Permit requires Dischargers to submit all sampling and analytical results for all individual or Qualified Combined Samples via SMARTS within 30 days of obtaining all results for each sampling event.

Nutrien Ag Solutions failed to upload into SMARTS within 30 days the following sampling and analytical results pursuant to Section XI.B.11.a of the General Permit:

| Sample Date | Date Uploaded into SMARTS |
|---|---|
| 1/8/2018 | 2/25/2018 |
| 3/22/2018 | 5/25/2018 |
| 4/7/2018 | 5/24/2018 |
| 1/15/2019 | 3/13/2019 |
| 2/13/2019 | 4/9/2019 |
| 1/28/2021 | 3/16/2021 |
| 10/22/2021 | 12/9/2021 |
| 3/15/2022 | 5/5/2022 |
| 3/28/2022 | 5/5/2022 |

7.  Failure to Analyze Storm Water Samples for the Correct Parameters

General Permit sections XI.B.6.a and XI.B.6.b require all Dischargers to analyze for the following three parameters, regardless of facility type:  pH, Total Suspended Solids (TSS) and Oil & Grease (O&G).

Section XI.B.6.c of the General Permit requires Dischargers to analyze for any additional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment contained in the Facility's SWPPP.

The Facility's SWPPP indicates the following additional parameters are associated with industrial materials or chemical present at the facility which are or could be subject to commingling with storm water:  **biochemical oxygen demand (BOD), chemical oxygen demand (COD), sulfur, chlorine, ammonia, boron, aluminum, calcium and copper.**

The storm water runoff sample analyses Nutrien Ag Solutions uploaded for samples collected on the dates listed below failed to include additional sampling parameters as outlined above.

| | |
|---|---|
| 1/8/2018 | 1/28/2021 |
| 3/22/2018 | 10/22/2021 |
| 4/7/2018 | 11/9/2021 |
| 1/15/2019 | 3/15/2022 |
| 2/13/2019 | 3/28/2022 |

### C.  *Deficient Annual Reports Submitted to the Regional Water Board*

Section XXI.L of the General Permit provides as follows:

**L. Certification**

Any person signing, certifying, and submitting documents under Section XXI.K above shall make the following certification:

*"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."*

Nutrien Ag Solutions has failed to comply with Sections XVI.A and XXI.L of the General Permit by failing to submit complete and accurate Annual Reports to the Regional Water Board for the reporting years 2017-2018, 2018-2019, 2019-2020 and 2020-2021.

The Annual Reports included Attachment 1 as an explanation for why Nutrien Ag Solutions failed to collect and analyze stormwater run-off during the required number of Qualifying Storm Events during the reporting years 2017-2018, 2018-2019, 2019-2020 and 2020-2021for all discharge locations, in accordance with Section XI.B.  Jacob Bowles and Joe Guido certified in the Reports, under penalty of perjury, that the required number of stormwater samples were not collected by the Facility because [allegedly] there were insufficient qualifying storm water discharges during the reporting years and scheduled facility operating hours.

However, records from the National Oceanic and Atmospheric Administration (NOAA) website/database confirm that during the reporting years in question there were in fact sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12 hours of the start of regular business hours to allow Nutrien Ag Solutions to have collected the requisite number of samples.

Specifically, Nutrien Ag Solutions' Annual Reports submitted to the Regional Water Board through the SMARTS system on July 3, 2018, August 5, 2019, September 18, 2020 and June 22, 2021 did not contain an acceptable reason for why the Facility failed to collect the appropriate number of stormwater samples.  Further, the Facility did not provide documentation regarding the alleged lack of discharge.

### D.  *Failure to File Timely Annual Reports*

Nutrien Ag Solutions has failed to comply with Section XVI.A of the General Permit, which provides as follows:  "The Discharger shall certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS."

Nutrien Ag Solutions' Annual Report for the reporting year 2019-2020 was filed late on September 18, 2020, resulting in a Notice of Non-Compliance from the Regional Water Board.

### E.  *Deficient BMP Implementation*

Sections I.C, V.A and X.C.1.b of the General Permit require Dischargers to identify and implement minimum and advanced Best Management Practices ("BMPs") that comply with the Best Available Technology ("BAT") and Best Conventional Pollutant Control Technology ("BCT") requirements of the General Permit to reduce or prevent discharges of pollutants in their storm water discharge in a manner that reflects best industry practice, considering technological availability and economic practicability and achievability.

EDEN alleges that Nutrien Ag Solutions has been conducting industrial activities at the site without adequate BMPs to prevent resulting non-storm water discharges.  Non-storm water discharges resulting from these activities are not from sources that are listed among the authorized non-storm water discharges in the General Permit, and thus are always prohibited.

Nutrien Ag Solutions' failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

*Specific BMP Deficiencies*

On July 1, 2017, the Facility entered Level 2 status for annual average exceedances of TSS, iron, nitrates (N+N), phosphorous and zinc.

On or about December 29, 2017, Rubik QISP Andrew Ellsmore evaluated the Facility, pursuant to Exceedance Response Action requirements of the General Permit for facilities entering Level 2 ERA status. Mr. Ellsmore's Level 2 ERA Action Plan certified on December 29, 2017, indicated the following continuing BMP deficiencies at the Facility:

- Inadequate housekeeping – sweeping, sediment cleanup
- Inadequate inlet pollutant filtration

EDEN's investigation confirms that some or all of the aforementioned BMP deficiencies are continuing to occur at the Facility.

## F. *Discharges In Violation of the General Permit*

Except as authorized by Special Conditions of the General Permit, Discharge Prohibition III(B) prohibits permittees from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Unauthorized non-storm water discharges must be either eliminated or permitted by a separate NPDES permit.

Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges.

EDEN alleges that the Discharger has discharged storm water containing excessive levels of pollutants from the Facility to its Receiving Waters during at least every significant local rain event over 0.1 inches in the last five (5) years.

EDEN hereby puts the Discharger on notice that each time the Facility discharges prohibited non-storm water in violation of Discharge Prohibition III.B of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

1. Discharges in Excess of Technology-Based Effluent Limitations

The Industrial General Permit includes technology-based effluent limitations, which prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of best available technology economically achievable ("BAT") for toxic pollutants and best conventional pollutant control technology ("BCT") for conventional pollutants. (General Permit, Section X.H.)

The EPA has published Benchmark values set at the maximum pollutant concentration levels present if an industrial facility is employing BAT and BCT, as listed in Table 2 of the General Permit.  The General Permit includes "Numeric Action Levels" ("NALs") derived from these Benchmark values; however, the NALs do not represent technology-based criteria relevant to determining whether an industrial facility has implemented BMPs that achieve BAT/BCT. (General Permit, Section I.M. (Finding 62)).

Nutrien Ag Solutions' exceedances of Benchmark values identified in the table listed below, indicate that it has failed and is failing to employ measures that constitute BAT and BCT, in violation of the requirements of the Industrial General Permit.   EDEN alleges and notifies Nutrien Ag Solutions that its storm water discharges from the Facility have consistently contained and continue to contain levels of pollutants that exceed Benchmark values as listed below.

These allegations are based on the Facility's self-reported data submitted to the Regional Water Board.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation." *Sierra Club v. Union Oil,* 813 F.2d 1480, 1492 (9th Cir. 1988).

Nutrien Ag Solutions' ongoing discharges of storm water containing levels of pollutants above EPA Benchmark values and BAT- and BCT-based levels of control also demonstrate that it has not developed and implemented sufficient BMPs at the Facility.  EPA Benchmarks are relevant to the inquiry as to whether a facility has implemented BMPs. [*Cal. Sportfishing Prot. Alliance v. River City Waste Recyclers, LLC* (E.D.Cal. 2016) 205 F.Supp.3d 1128; *Baykeeper v. Kramer Metals, Inc.* (C.D.Cal. 2009) 619 F.Supp.2d 914, 925; *Waterkeepers Northern California v. AG Industrial Mfg. Inc.* (9th Cir. 2004) 375 F.3d 913, 919 (concentration levels in excess of EPA benchmarks are evidence supporting the citizen plaintiff's contention that defendant did not have appropriate BMPs to achieve BAT/BCT).]

Nutrien Ag Solutions' failure to develop and/or implement adequate BMPs and pollution controls to meet BAT and BCT at the Facility violates and will continue to violate the CWA and the Industrial General Permit each day the Facility discharges storm water without meeting BAT and BCT.

   2.   Discharges in Excess of Receiving Water Limitations

In addition to employing technology based effluent limitations, the Industrial General Permit requires dischargers to comply with Receiving Water Limitations.  Receiving Water Limitations found in Section VI of the General Permit prohibit storm water discharges and authorized non-storm water discharges to surface water that adversely impact human health or the environment.

Discharges that contain pollutants in concentrations that exceed levels known to adversely impact aquatic species and the environment also constitute violations of the General Permit Receiving Water Limitation.

Applicable Water Quality Standards ("WQS") are set forth in the California Toxics Rule ("CTR") and the Regional Basin Plan.  Exceedances of WQS are violations of the Industrial General Permit, the CTR, the Basin Plan, any parameter included as an impairment for the Facility's Receiving Waters on the 303(d) listing, and any parameters identified by the Regional Water Board as parameters assigned a total maximum daily load (TMDL).

Industrial storm water discharges must strictly comply with WQS, including those criteria listed in the applicable Basin Plan.  (See *Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999).)

The Basin Plan establishes WQS for the Sacramento-San Joaquin River Delta and its tributaries, including but not limited to the following:

• Waters shall not contain substances in concentrations that result in the deposition of material that cause nuisance or adversely affect beneficial uses.

• Waters shall not contain suspended material in concentrations that cause nuisance or adversely affect beneficial uses.

• Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.

•    All waters shall be maintained free of toxic substances in concentrations that are lethal to or that produce other detrimental responses in aquatic organisms.

• Surface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.

Information available to EDEN indicates that the Facility's storm water discharges contain elevated concentrations of specific pollutants, as listed below.   These polluted discharges can be acutely toxic and/or have sub-lethal impacts on the avian and aquatic wildlife in the Receiving Waters.  Discharges of elevated concentrations of pollutants in the storm water from the Facility also adversely impact human health.  These harmful discharges from the Facility are violations of the General Permit Receiving Water Limitation.

Further, EDEN puts Nutrien Ag Solutions on notice that the Receiving Water Limitations are independent requirements that must be complied with, and that carrying out the process

triggered by exceedances of the NALs listed at Table 2 of the General Permit does not amount to compliance with the Receiving Water Limitations.  The NALs do not represent water quality-based criteria relevant to determining whether an industrial facility has caused or contributed to an exceedance of a WQS, or whether it is causing adverse impacts to human health or the environment.

Section XX.B of the General Permit provides that when a facility's industrial storm water discharges and/or authorized NSWDs are determined to contain pollutants that are in violation of Receiving Water Limitations contained in Section VI, the Discharger must conduct a facility evaluation to identify pollutant source(s) within the facility that are associated with industrial activity and whether the BMPs described in the SWPPP have been properly implemented, assess its current SWPPP, and certify via SMARTS any additional BMPs identified which are necessary in order to meet the Receiving Water Limitations.

Specific receiving water limitation pollutants are found at the Nutrien Ag Facility and require additional sampling parameters.  Additional parameters include:  **BOD, COD, copper, chloripyrifos** *(which contains sampling parameters phosphorous, chlorine, nitrates (N+N) and sulfur)*, **diazinon** *(which contains sampling parameters phosphorous, nitrates (N+N) and sulfur)*, and **carcinogenic pesticides** *(glyphosate, malathion, oryzalin, paraquat dichloride and propargite).*  Glyphosate, malathion, oryzalin, paraquat dichloride and propargite contain the following sampling parameters:  **phosphorous, BOD, COD, N+N, sulfur and chlorine**

EDEN alleges that from at least October 15, 2017, to the present, Nutrien Ag Solutions has been in violation of the Receiving Water Limitations provision of Section VI of the General Permit, as evidenced by its exceedances of the applicable Water Quality Standards set forth in the Regional Basin Plan, indicated below.

Specifically, Nutrien Ag Solutions' sample analyses summarized below violate the strict numeric effluent limitations (NELs) established for Sacramento-San Joaquin River Delta and Lower Mokelumne River.

Further, Nutrien Ag Solutions has failed to comply with Section XX.B of the General Permit.  Failure to comply with the additional Water Quality-Based Corrective Action requirements listed in Section XX.B is an additional violation of the General Permit.

The following discharges of pollutants from the Facility have violated Discharge Prohibitions of the General Permit and are evidence of ongoing violations of Effluent Limitations:

| Sample Collection Date | Outfall | Parameter | Sample Analysis Result* |
|---|---|---|---|
| | | **Reporting Year 2017-18** | |
| 1/8/2018 | North Catch A | Iron | 8.5 |
| | | Phosphorous | 5.8 |
| | | N+N | 4.3 |
| | | Zinc | 0.24 |
| | | pH | 6.4 |
| | North Catch B | Iron | 8.7 |
| | | N+N | 23 |
| | | Zinc | 0.11 |
| | Road Catch | Iron | 7.2 |
| | | N+N | 5 |
| | | Zinc | 0.33 |
| | | pH | 6.4 |
| | Clean Equip Yard | Iron | 14 |
| | | N+N | 9.9 |
| | | Zinc | 0.14 |
| | | TSS | 220 |
| | | pH | 6.3 |
| 3/22/2018 | North Catch A | Iron | 47 |
| | | Phosphorous | 11 |
| | | N+N | 4.8 |
| | | Zinc | 1.3 |
| | | TSS | 450 |
| | South Catch B | Iron | 14 |
| | | Phosphorous | 3.6 |
| | | N+N | 6 |
| | | Zinc | 0.13 |
| | | TSS | 110 |
| | Road Catch | Iron | 14 |
| | | N+N | 14 |
| | | Zinc | 0.52 |
| | Clean Yard | Iron | 1.5 |
| 4/7/2018 | North Catch A | Iron | 1.9 |
| | | N+N | 2 |

| Sample Collection Date | Outfall | Parameter | Sample Analysis Result* |
|---|---|---|---|
| | | Zinc | 0.13 |
| | South Catch B | Iron | 4.6 |
| | | Phosphorous | 3 |
| | | N+N | 6.4 |
| | Road Catch | Iron | 1.7 |
| | | Phosphorous | 5 |
| | | N+N | 4.7 |
| | | Zinc | 0.27 |
| | Clean Equip Yard | Iron | 0.88 |
| | | | |
| **Reporting Year 2018-19** | | | |
| 1/15/2019 | North Catch A | Iron | 32 |
| | | Phosphorous | 6.7 |
| | | N+N | 9.1 |
| | | Zinc | 0.88 |
| | | TSS | 420 |
| | South Catch B | Iron | 21 |
| | | Phosphorous | 3.2 |
| | | N+N | 22 |
| | | Zinc | 0.24 |
| | | TSS | 200 |
| | Road Catch | Iron | 1.1 |
| | | N+N | 0.71 |
| | | Zinc | 0.97 |
| | Drain Ditch | Iron | 8.5 |
| | | Phosphorous | 5.3 |
| | | N+N | 1.6 |
| | | TSS | 110 |
| 2/13/2019 | North Catch A | Iron | 24 |
| | | Phosphorous | 3.2 |
| | | N+N | 2.7 |
| | | Zinc | 0.53 |
| | | TSS | 280 |
| | South Catch B | Iron | 11 |

| Sample Collection Date | Outfall | Parameter | Sample Analysis Result* |
|---|---|---|---|
| | | N+N | 2.7 |
| | | Zinc | 0.13 |
| | | TSS | 120 |
| | Road Catch | Iron | 4.7 |
| | | N+N | 3.1 |
| | | Zinc | 0.34 |
| | Drain Ditch | Iron | 13 |
| | | Phosphorous | 2.1 |
| | | N+N | 3.5 |
| | | Zinc | 0.19 |
| | | TSS | 150 |
| | Clean Equip Yard | Iron | 1.6 |
| | | N+N | 1.1 |
| | | | |
| **Reporting Year 2019-20** | | | |
| No samples taken | | | |
| | | | |
| **Reporting Year 2020-21** | | | |
| 1/28/2021 | Outfall | Iron | 5.5 |
| | | N+N | 11 |
| | | Zinc | 0.13 |
| | | | |
| **Reporting Year 2021-22** | | | |
| 10/22/2021 | Outfall | Iron | 6.2 |
| | | N+N | 42 |
| | | Zinc | 0.19 |
| 11/9/2021 | Outfall | Iron | 2 |
| | | Phosphorous | 2.2 |
| | | N+N | 45 |
| | | Zinc | 0.42 |
| | | pH | 6 |
| 3/15/2022 | Outfall | Iron | 2.7 |
| | | Phosphorous | 2.3 |
| | | N+N | 2.8 |
| | | Zinc | 0.42 |

| Sample Collection Date | Outfall | Parameter | Sample Analysis Result* |
|---|---|---|---|
| 3/28/2022 | Outfall | Iron | 1.9 |
| | | N+N | 14 |
| | | Zinc | 0.13 |
| | | | |

*All units are listed in milligrams per liter (mg/L), except pH, which is listed in pH units (SU)

Listed below are the EPA Benchmark numeric action levels associated with the parameters, as identified on **Table 2 of the General Permit,** as well as the Maximum Contaminant Levels (MCLs) listed in the **California Code of Regulations, Title 22, Section 64431** (Table 64431-A) and the Water Quality Control Plan **(Basin Plan)** for the **California Regional Water Quality Control Board, Central Valley Regional, Fifth Edition** (Revised May 2018), Basin Plan Table 3-1, Trace Element Water Quality Objectives.

| Parameter | EPA Benchmark Annual NAL | EPA Benchmark NAL instantaneous Value | CV BASIN PLAN Table 3-1 MCL value | CCR Title 22 Section 64431 |
|---|---|---|---|---|
| pH | N/A | >6 or <9 SU | >6.5 or >8.5 | N/A |
| Total Suspended Solids (TSS) | 100 mg/L | 400 mg/L | N/A | N/A |
| Oil & Grease | 15 mg/L | 25 mg/L | N/A | N/A |
| Zinc | .26 mg/L | N/A | .10 mg/L | N/A |
| Copper | .0332 mg/L | N/A | .0056 mg/L | N/A |
| Lead | .262 mg/L | N/A | N/A | .05 mg/L |
| Chemical Oxygen Demand (COD) | 120 mg/L | N/A | N/A | N/A |
| Biochemical Oxygen Demand (BOD) | 30 mg/L | N/A | N/A | N/A |
| Aluminum | .75 mg/L | N/A | N/A | 1.0 mg/L |
| Iron | 1.0 mg/L | N/A | .30 mg/L | N/A |
| Nitrate + Nitrate Nitrogen | .68 mg/L | N/A | N/A | 45 mg/L |
| Phosphorus | 2.0 mg/L | N/A | N/A | N/A |
| Ammonia | 2.14 mg/L | N/A | N/A | N/A |
| Magnesium | .064 mg/L | N/A | N/A | N/A |
| Arsenic | .064 mg/L | N/A | N/A | N/A |
| Cadmium | .0053 mg/L | N/A | .00022 mg/L | .01 mg/L9i |
| Nickel | 1.02 mg/L | N/A | N/A | N/A |
| Mercury | .0014 mg/L | N/A | N/A | N/A |

| Parameter | EPA Benchmark Annual NAL | EPA Benchmark NAL instantaneous Value | CV BASIN PLAN Table 3-1 MCL value | CCR Title 22 Section 64431 |
|---|---|---|---|---|
| Selenium | .005 mg/L | N/A | N/A | N/A |
| Silver | .0183 mg/L | N/A | .01 mg/L | .05 mg/L |

3.   Discharges in Excess of 40 CFR Subchapter N Effluent Limitation Guidelines

Pursuant to Section V.B of the General Permit, storm water dischargers from facilities subject to storm water effluent limit guidelines ("ELGs") for dischargers subject to 40 Code of Federal Regulations Chapter I, Subchapter N ("Subchapter N"), commencing with Section 405 shall not exceed their respective storm water ELGs.

As stated above, Nutrien Ag Solutions is a facility which distributes pre-packaged agricultural products and blends liquid fertilizers. Facility operations are covered under SIC Code 2875. Pursuant to Subchapter N and Attachment F of the General Permit, and as detailed in the chart below, Nutrien Ag Solutions' parameter exceedances are in violation of Section V.B of the General Permit.

| Covered Industry | pH SU | TSS mg/L | O&G HEM | Phos (P) | BOD mg/L | Ammonia as N mg/L |
|---|---|---|---|---|---|---|
| Airports (Deicing) 40 CFR §449.10 | | | | | | 14.7 |
| Asphalt Plants 40 CFR §443.13 | 6-9 | 23 | 15 | - | - | - |
| Cement Manufacturing 40 CFR §411.32 | 6-9 | 50 | - | - | - | - |
| Fertilizer Manufacturing 40 CFR § 418.12 | 6-9 | 150 | | 105 | | |

According to Attachment F and the Nutrien Ag ELG operations described in the SWPPP, the following additional pollutants should be sampled:  **fluoride** (by-product from superphosphate production), **BOD and ammonia.**

### G.   *Failure to Comply with Exceedance Response Action Requirements*

As of July 1, 2015, the date the current General Permit became effective, all Dischargers were in "Baseline status" for all parameters listed in Table 2 of the Permit.   (General Permit, Section XII.B.

Level 1 ERA Evaluation and Report

Pursuant to Section XII.C of the General Permit, a Discharger's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate either an annual average or instantaneous NAL exceedance for that same parameter.

Level 1 status commences on July 1 following the Reporting Year during which the exceedance(s) occurred, and the Discharger enters the Exceedance Response Action ("ERA") process. The ERA process requires the discharger to conduct a Level 1 ERA Evaluation, with the assistance of a Qualified Industrial Storm Water Practitioner ("QISP"), of the industrial pollutant sources at the Facility that are or may be related to the NAL exceedance(s), by October 1 following commencement of Level 1 status.

The Level 1 ERA Evaluation must include the identification of the corresponding BMPs in the SWPPP, as well as any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit.

Based upon the Level 1 ERA Evaluation, the Discharger is required to, as soon as practicable, but no later than January 1 following commencement of Level 1 status, prepare a Level 1 ERA Report. (Section XII.C.2). The Level 1 Report must be prepared by a QISP and must include a summary of the Level 1 ERA Evaluation, a detailed description of the necessary SWPPP revisions, and any additional BMPs for each parameter that exceeded an NAL.

The SWPPP revisions and additional BMP development and implementation must also be completed by January 1. The Level 1 status discharger is required to submit via SMARTs the Level 1 ERA Report certifying that the Level 1 ERA Evaluation has been conducted, and necessary SWPPP revisions and BMP implementation has been completed. The certification also requires the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status.

A Discharger's Level 1 status for a parameter will return to Baseline status if a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four (4) consecutive qualified storm events that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter.

Level 2 ERA Action Plan

A Discharger will enter Level 2 status if there is an NAL exceedance of the same parameter occurring during the time the Discharger is in Level 1 status.

By January 1 following the reporting year during which the NAL exceedance(s) occurred, Dischargers in Level 2 status must certify and submit via SMARTS a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance.

For each new Level 2 exceedance, the Level 2 Action Plan must select one or more of three available "demonstrations" the Facility will perform to address the exceedance(s). These demonstrations include (a) Industrial Activity BMPs; (b) Non-Industrial Pollutant Source Demonstration; and (c) Natural Background Pollutant Source Demonstration, and are more fully described below under the Level 2 Technical Report provisions.

The Level 2 ERA Action Plan must address all drainage areas with corresponding Level 2 exceedances and must include a time schedule and detailed description of the specific tasks required to complete the selected demonstration(s). Further, all elements of the Action Plan must be implemented as soon as possible and completed no later than one year following the submission of the Action Plan.

<u>Level 2 ERA Technical Report</u>

On January 1 of the reporting year following submittal of a Level 2 ERA Action Plan, Dischargers in Level 2 must certify and submit a Level 2 ERA Technical Report prepared by a QISP that includes the Facility's selection of either:

(a) *Industrial Activity BMP Demonstration* (whereby the Facility evaluates their implemented BMPs and additional BMPs identified in the Level 2 ERA Action Plan to determine whether implementation of the BMPs has achieved compliance with the effluent limitations of the General Permit and are expected to eliminate future NAL exceedances;

(b) *Non-Industrial Pollutant Source Demonstration* (whereby the Facility determines that its NAL exceedances are attributable solely to the presence of non-industrial pollutant sources); or

(c) *Natural Background Pollutant Source Demonstration* (whereby the Facility determines that its NAL exceedances are attributable solely to the presence of pollutants in the natural background that has not been disturbed by industrial activities).

**<u>Deficient Level 2 ERA Action Plan</u>**

While in Level 1 status, the Facility again exceeded the EPA Benchmark NAL for TSS, iron, N+N, phosphorous and zinc. These results elevated Nutrien Ag Solutions to Level 2 Status on July 1, 2017, pursuant to Section XII.D of the General Permit.

Pursuant to Section XII.D.1 of the General Permit, the Facility was required to have a QISP certify and submit via SMARTS a Level 2 ERA Action Plan that addresses each new Level 2 NAL exceedance at the Facility, and to do so on or before January 1, 2018.

Nutrien Ag Solutions submitted to SMARTS a Level 2 ERA Action Plan on December 29, 2017.  However, the Level 2 ERA Action Plan Report does not comport with the requirements of Section XII.D of the General Permit.

Specifically, although the Facility's Level 2 ERA Action Plan identifies which of three demonstrations delineated in Section XII.D.2.a through D.2.c that the Discharger has selected to perform, the selected demonstration does not adequately address as potential pollutants all industrial materials and chemicals stored and used at the facility.

Further, the Action Plan fails to address all drainage areas with corresponding Level 2 NAL exceedances.

**Deficient Level 2 Technical Report**

Pursuant to Section XII.D.2. of the General Permit, the Facility was required to have a QISP certify and submit via SMARTS a Level 2 Technical Report Plan on or before January 1, 2019.

Nutrien Ag Solutions submitted a Level 2 Technical Report on June 28, 2019.  However, the Report does not comport with the requirements of Section XII.D.2 of the General Permit.

Specifically, the Facility's Technical Report fails to adequately justify its selection of a Non-Industrial Pollutant Source Demonstration, pursuant to Section XII.D.2.b of the General Permit.

### H.  *Failure to Comply with Facility SWPPP*

The Facility's SWPPP indicates that the Facility will collect and analyze storm water samples from two qualified storm events within the first half of each reporting year (July 1 to December 31) and two QSEs within the second half of each reporting year (January 1 to June 30).

As detailed above, the Facility missed collecting storm water samples in the reporting years 2017-2018, 2018-2019, 2019-2020 and 2020-2021.

### I.   *Failure to Properly Train Employees/Facility Pollution Prevention Team*

Section X.D.1 of the General Permit requires each Facility to establish a Pollution Prevention Team responsible for assisting with the implementation of the requirements of the General Permit. The Facility is also required to identify alternate team members to implement the SWPPP and conduct required monitoring when the regularly assigned Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of town business, or other absences).

Section X.H.f of the General Permit also requires that each Facility ensure that all Pollution Prevention Team members implementing the various compliance activities of the General Permit are properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities. Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

Based on the foregoing violations, it is clear that Nutrien Ag Solutions has either not properly established its Pollution Prevention Team, or has not adequately trained its Pollution Prevention Team, in violation of Sections X.D.1 and X.H.f of the General Permit.

Nutrien Ag Solutions may have had other violations that can only be fully identified and documented once discovery and investigation have been completed.  Hence, to the extent possible, EDEN includes such violations in this Notice and reserves the right to amend this Notice, if necessary, to include such further violations in future legal proceedings.

### IV.   THE PERSON OR PERSONS RESPONSIBLE FOR THE VIOLATIONS

The individuals and entities responsible for the alleged violations are Nutrien Ag Solutions, Inc., Crop Production Services, Inc., dba Nutrien Ag Solutions, and Nutrien Ltd, as well as their respective corporate officers and employees of the Facility responsible for compliance with the CWA.

### V.   THE DATE, DATES, OR REASONABLE RANGE OF DATES OF THE VIOLATIONS

The range of dates covered by this 60-day Notice is October 15, 2017, to the date of this Notice.  EDEN may from time to time update this Notice to include all violations which may occur after the range of dates covered by this Notice.  Some of the violations are continuous in nature; therefore, each day constitutes a violation.

## VI.    CONTACT INFORMATION

The entity giving this 60-day Notice is:

Central Valley EDEN ENVIRONMENTAL DEFENDERS, LLC
1520 E. Covell Blvd, Suite B5
Davis, CA  95616
(800) 545-7215

**To ensure an expedited response to this Notice, please send all initial communications to the following email address:**  responses@edendefenders.org.

## VII.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

CWA §§ 505(a)(1) and 505(f) provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for un-permitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), §1362(5).

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty for all violations occurring during the period commencing five (5) years prior to the date of the Notice Letter.  **These provisions of law currently authorize civil penalties of $56,460.00 per day, for each violation occurring on or after November 2, 2015.**

In addition to civil penalties, EDEN will seek injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d), declaratory relief, and such other relief as permitted by law.

**Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d) and California Code of Civil Procedure §1021.5, EDEN will seek to recover its pre and post-litigation costs, including all attorneys' and experts' fees and costs incurred** (see *Southern California Alliance of Publicly Owned Treatment Works v. U.S. Environmental Protection Agency* (9th Cir. 2017) 853 F.3d 1076; *Vasquez v. State of California* (2008) 45 Cal.4th 243).

## VIII.    CONCLUSION

The CWA specifically provides a 60-day notice period to promote resolution of disputes. EDEN encourages Nutrien Ag Solutions' counsel to contact EDEN within 20 days of receipt of this Notice by sending an email to responses@edendefenders.org to initiate a discussion regarding the violations detailed herein and to determine how Nutrien Ag Solutions may resolve this matter without the necessity of litigation.

During the 60-day notice period, EDEN is willing to discuss effective remedies for the violations; however, if Nutrien Ag Solutions wishes to pursue such discussions in the absence of litigation, it is suggested those discussions be initiated soon so that they may be completed before the end of the 60-day notice period.

If EDEN does not receive a response from Nutrien Ag Solutions or its counsel before the expiration of the 60-day notice period, this matter will be transferred to EDEN's litigation counsel. Thank you.

Sincerely,

*EDEN Environmental Defenders*

Copies to:

Michael Regan, Director, U.S. Environmental Protection Agency, regan.michael@epa.gov
Regional Administrator, U.S. EPA – Region 9
Sarah Rowan:   rowan.sarah@epa.gov   and Laurie Kermish:   kermish.laurie@epa.gov
Eileen Sobeck, State Water Resources Control Board, eileen.sobeck@waterboards.ca.gov
Mayumi Okamoto, State Water Board Office of Enforcement:   Mayumi.Okamoto@waterboards.ca.gov
California Water Boards Stormwater Program, stormwater@waterboards.ca.gov